IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-1035

 Filed: 5 November 2019

Camden County, No. 15CRS50149

STATE OF NORTH CAROLINA

 v.

KAMANI AMES, Defendant.

 Appeal by Defendant from judgment entered 19 January 2018 by Judge Jerry

R. Tillett in Camden County Superior Court. Heard in the Court of Appeals 7 August

2019.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Derrick
 C. Mertz, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender James R.
 Grant, for Defendant.

 BROOK, Judge.

 Kamani Ames (“Defendant”) appeals from judgment entered upon a jury

verdict finding him guilty of first-degree murder. On appeal, Defendant challenges

his sentence of life without the possibility of parole. Defendant argues that the trial

court applied the incorrect legal standard in sentencing him to the harshest

punishment possible for a crime he committed as a juvenile. We agree. We therefore

vacate the trial court’s judgment and remand the case for re-sentencing.

 I. Factual and Procedural Background
 STATE V. AMES

 Opinion of the Court

 A. Background Facts

 On 27 September 2015, 18-year-old Nahcier Brunson shot and killed 17-year-

old Unique Graham in Camden Causeway Park. The only witness was Defendant,

then 17 years old.

 Graham and Brunson and Defendant knew one another through Defendant’s

sister. Graham and Defendant’s sister were dating at the time of the shooting. Their

relationship had caused friction between Graham and Defendant; both parties had

pressed criminal charges against each other that were subsequently dismissed. At

the same time, Brunson was “dating [and] messing around” with Defendant’s sister.

Brunson and Defendant were new acquaintances, having only known each other for

approximately two weeks at the time of the shooting.

 B. The Murder, Investigation, and Trial

 The evidence at trial tended to show that Defendant went to law enforcement

the day after the shooting, 28 September 2015. He stated that he had discussed

robbing a drug dealer with Brunson and Graham. However, while acknowledging

that he was present when Brunson shot and killed Graham, he claimed he played no

part in the shooting. Police then arrested Defendant for being an accessory after the

fact. After his arrest, Defendant claimed he was not actually present at the shooting.

 While interviewing Defendant, police executed a search warrant of his house.

There they found a gun, which Defendant admitted was used in the murder. Police

then placed Defendant under arrest for first-degree murder.

 2
 STATE V. AMES

 Opinion of the Court

 When confronted by police, Brunson initially claimed that he played no role in

the killing. Within the next two days, however, he accepted full responsibility,

indicating that he had acted alone in killing Graham. After his arrest, Brunson said

the same in a letter to Defendant’s trial lawyer and in an interview with a local news

channel.1

 At the trial, however, Brunson testified that Defendant had orchestrated the

killing. More particularly, Brunson testified that on the evening of 27 September

2015 Defendant drove him to Camden Causeway Park. Once at the park, Defendant

and Brunson both walked down the wooden walkway. According to Brunson’s trial

testimony, Defendant then called Graham and asked him to participate in a robbery

with them. Graham agreed. Defendant asked Brunson who should hold the gun on

the way to pick up Graham; believing this to be a question about who would be armed

during the robbery, Brunson volunteered to do so and put Defendant’s gun in his

waistband. After picking Graham up, the three youths returned to the walkway at

Camden Causeway Park to smoke marijuana. After Brunson and Defendant finished

smoking marijuana, Brunson testified that Defendant “fell back” as they walked

down the walkway. Defendant then “indicated” for Brunson to shoot Graham by

tapping Brunson and making his hand into the shape of a gun. Brunson testified

 1 Brunson ultimately pleaded guilty to first-degree murder.

 3
 STATE V. AMES

 Opinion of the Court

that he looked at Defendant twice to see if “he was for real[,]” and then he shot and

killed Graham.

 At trial, the State also introduced “kites,” or jail letters, between Defendant

and Brunson written while both were incarcerated and awaiting trial. One found in

Defendant’s cell read in part:

 I [Defendant] was told that if he does tell the court people
 that I was honestly had nothing to do with the murder and
 that he [Brunson] kidnapped me, then that will help me
 out a lot and they just drop the charges against me . . . . If
 they do drop the charges against me, then I still got to fight
 to get the murder charges dropped, but what he would have
 to tell them is I had nothing to do with it and he made me
 drive him back[.]

This communication came after Brunson told police he alone was responsible for the

murder and gave a news interview stating the same, but before his letter to

Defendant’s trial counsel accepting full responsibility.

 A fellow inmate also testified that Defendant confessed to him that “he planned

the murder.”

 Defendant was convicted of first-degree murder by a jury on 19 January 2018.

 C. The Sentencing Hearing

 In the same court session, the trial court conducted a brief sentencing hearing.

Defense counsel called one witness, Defendant’s mother. She testified that Defendant

grew up in a household plagued by domestic violence and was exposed to violence

visited upon her by both his father and stepfather. She further testified Defendant

 4
 STATE V. AMES

 Opinion of the Court

played football and ran track in high school while also maintaining good grades.

Finally, she testified that Defendant completed high school and earned his high

school diploma while incarcerated awaiting trial.

 Defense counsel argued that a sentence of life without parole was

inappropriate based on this evidence. Defendant had no prior criminal record, was

not the shooter, and there was a “strong likelihood that [Defendant would] benefit

from rehabilitation and confinement.” Counsel contended confinement had not

“stop[ped] [Defendant] from moving on with parts of his life[,]” referencing his

completion of his high school education while in jail.

 The State asked for a sentence of life without the possibility of parole. The

State argued Defendant “manipulated” the shooter, Brunson, and that Defendant had

“manifest[ed] an effort to, in some respects, obstruct justice.” Finally, the State

contended Defendant had not “show[n] a second of remorse” for the period leading up

to and during trial. The State presented no evidence at sentencing.

 In an oral order, the trial court sentenced Defendant to life without the

possibility of parole. The court’s oral order was as follows:

 At this juncture, the Court has considered the arguments
 made. The Court’s considered the factors of mitigation that
 are possible under Chapter 15A-1340.19B, together with
 those that have been argued by defense counsel and the
 State.

 The Court finds that the defendant did have no record at
 the time – no prior criminal record at the time of this

 5
 STATE V. AMES

 Opinion of the Court

offense. The Court finds that he was 17 at the time of the
offense. The Court finds that the defendant has
demonstrated that he did have an ability to appreciate the
risk and consequences of his conduct in that he engaged at
various times throughout the process and the process of
investigation with schemes to cover his conduct or deter
others from providing information that would be
detrimental to him.

In addition, the Court finds that there is no evidence of
immaturity that would be countenanced under what the
Court interprets the intentions of this statute, which has a
narrow application to a person who is convicted of first
degree murder who, at the time, had not attained the age
of 18. Limited to that general class of persons, the Court
finds there is no evidence of immaturity that would not
otherwise be applicable to all those within that class.

The Court finds that there is no evidence of mental illness
or impairment. There’s no evidence of any familial or peer
pressure exerted upon the defendant relative to the
commission of this offense.

The Court does find that the defendant had an intellectual
capacity that was not impaired and may have been, in fact,
above average in that the defendant had been transferred
or made arrangements to be transferred to a different high
school other than his original county, was participating in
sports and was making As, Bs, and Cs.

The Court finds that there is no evidence before the Court
at this juncture of the likelihood that the defendant would
benefit from rehabilitation and confinement other than
that of other class of persons who may be incarcerated or
may be incarcerated for the offense of first degree murder.

The Court finds that the mitigating factors that have been
found, that is of no record and the age, are outweighed by
the other evidence in this case of the nature of the offense
and the manner in which it was committed, specifically

 6
 STATE V. AMES

 Opinion of the Court

 that of involving another person who the Court concludes
 was manipulated by the defendant; also taking advantage
 of a position of what may have been trust or confidence in
 that the victim was — a scheme was concocted to lure the
 victim to ride with the defendant under a ruse and under a
 scheme which ultimately resulted in his vulnerability and
 his death.

 The Court concludes that life without parole is the
 appropriate sentence.

 Prior to trial, the State had offered Defendant a plea deal that would have

resulted in him serving 16 to 30 years in prison. He rejected this proposed plea deal.

 II. Analysis

 Defendant argues on appeal that the trial court sentenced him based on the

incorrect legal standard in violation of the Eighth Amendment’s prohibition against

cruel and unusual punishment. In assessing this argument, we review the governing

federal and state jurisprudence on the punishment of juvenile offenders. These cases

compel the conclusion that the trial court applied the incorrect legal standard and

also improperly compared the juvenile Defendant to adult offenders – errors the

approach advocated in the dissent would perpetuate. Thus, we vacate the trial court’s

judgment and remand for re-sentencing consistent with this opinion.

 A. Standard of Review

 Findings of fact by a trial court are reviewed to determine if they are supported

by competent evidence. State v. Williams, 362 N.C. 628, 632, 669 S.E.2d 290, 294

(2008), pet. for discretionary rev. allowed by ___ N.C. ___, ___, 828 S.E.2d 21, 22

 7
 STATE V. AMES

 Opinion of the Court

(2019). “The trial court’s weighing of mitigating factors” pertaining to the sentencing

of juveniles convicted of first-degree murder subject to punishments including life

without the possibility of parole “is reviewed for an abuse of discretion.” State v.

Sims, ___ N.C. ___, ___, 818 S.E.2d 401, 406 (2018) (citation omitted). Questions and

conclusions of law, however, are reviewable de novo. Williams at 632, 669 S.E.2d at

294. Under de novo review, we “consider[] the matter anew and freely substitute[]

[our] own judgment for that of the lower tribunal.” Id. at 632-33, 669 S.E.2d at 294

(citation omitted).

 B. United States Supreme Court Case Law on the Punishment of Juvenile
 Offenders
 The jurisprudence pertaining to the punishment of juvenile defendants has

undergone a sea change in the last generation. We briefly review the key cases

central to this shift as well as their key lessons below.

 In 2005, the United States Supreme Court held that the imposition of the death

penalty on a juvenile offender violates the Eighth Amendment’s ban on cruel and

unusual punishments. Roper v. Simmons, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed.2d

1 (2005). This path-marking decision held that “[t]hree general differences between

juveniles under 18 and adults” counsel against finding a juvenile defendant “among

the worst offender[s]” subject to the harshest penalties. Id. at 569, 125 S. Ct. at 1195.

First, “[a] lack of maturity and an underdeveloped sense of responsibility are found

in youth more often than in adults and are more understandable among the young.

 8
 STATE V. AMES

 Opinion of the Court

These qualities often result in impetuous and ill-considered actions and decisions.”

Id. (quoting Johnson v. Texas, 509 U.S. 350, 367, 113 S. Ct. 2658, 2668-69, 125 L.

Ed.2d 290, 305 (1993)). Second, “juveniles have less control, or less experience with

control, over their own environment.” Roper at 569, 125 S. Ct. at 1195 (“[A]s legal

minors, [juveniles] lack the freedom that adults have to extricate themselves from a

criminogenic setting[.]”) (quoting Laurence Steinberg & Elizabeth Scott, Less Guilty

by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and

the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). Third, science

and common sense make plain that “the character of a juvenile is not as well formed

as that of an adult.” Roper, 543 U.S. at 570, 125 S. Ct. at 1195. Their transitory

personality traits mean that “a greater possibility exists that a minor’s character

deficiencies will be reformed.” Id., 125 S. Ct. at 1195-96; Thompson v. Oklahoma, 487

U.S. 815, 837, 108 S. Ct. 2687, 2699, 101 L. Ed.2d 702, 719 (1988) (noting a “teenager’s

capacity for growth”).

 These differences, in turn, undermine the penological justifications for

subjecting juveniles to the harshest punishments. “[T]he case for retribution is not

as strong with a minor as with an adult” as their “culpability or blameworthiness is

diminished, to a substantial degree, by reason of youth and immaturity.” Roper, 543

U.S. at 571, 125 S. Ct. at 1196. Further, the remote “likelihood that the teenage

offender has made the kind of cost-benefit analysis that attaches any weight” to harsh

 9
 STATE V. AMES

 Opinion of the Court

penalties undercuts their deterrent effect. Id. at 572, 125 S. Ct. at 1196 (quoting

Thompson, 487 U.S. at 837, 108 S. Ct. at 2700).

 Five years later, the United States Supreme Court held that a sentence of life

without the possibility of parole for juvenile offenders in non-homicide cases violates

the Eighth Amendment. Graham v. Florida, 560 U.S. 48, 82, 130 S. Ct. 2011, 2034,

176 L. Ed.2d 825, 850 (2010). In reiterating that juveniles’ “lessened culpability”

make them “less deserving of the most severe punishments[,]” the Court again

pointed to “developments in psychology and brain science” that “continue to show

fundamental differences between juvenile and adult minds” in the “parts of the brain

involved in behavior control.” Id. at 68, 130 S. Ct. at 2026. The Court also noted that

life without the possibility of parole as a penalty is the “second most severe penalty

permitted by law[,]” sharing “some characteristics with death sentences that are

shared by no other sentences.” Id. at 69, 130 S. Ct. at 2027 (quoting Harmelin v.

Michigan, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed.2d 836, 869 (1991)

(Kennedy, J., concurring in part and concurring in the judgment)). This overlap

includes the “denial of hope” rendering “good behavior and character improvement .

. . immaterial[.]” Graham, 560 U.S. at 71, 130 S. Ct. at 2027 (internal marks and

citation omitted). Bringing together these two threads, the Court noted, “[l]ife

without parole is an especially harsh punishment for a juvenile[,]” as a “16-year-old

 10
 STATE V. AMES

 Opinion of the Court

and a 75-year-old” each sentenced thus “receive the same punishment in name only.”

Graham, 560 U.S. at 70, 130 S. Ct. at 2028.

 And two years later, the United States Supreme Court held that “a sentencing

scheme that mandates life in prison without possibility of parole for juvenile

offenders” in homicide cases violates the Eighth Amendment. Miller v. Alabama, 567

U.S. 460, 479, 132 S. Ct. 2455, 2469, 183 L. Ed.2d 407, 424 (2012). It so held because

such mandatory regimes preclude consideration of an offender’s age and “family and

home environment” as well as potential mitigating factors pertaining to the homicide,

such as the fact that the offender “might have been . . . convicted of a lesser offense if

not for incompetencies associated with youth – for example, his inability to deal with

. . . prosecutors (including on a plea agreement)[,]” and, finally, “the possibility of

rehabilitation[.]” Id. at 477-78, 132 S. Ct. at 2468.

 Most recently, in Montgomery v. Louisiana, ___ U.S. ___, ____, 136 S. Ct. 718,

734, 193 L. Ed.2d 599, 620 (2016), the Supreme Court concluded that Miller’s

prohibition on mandatory life without the possibility of parole for juveniles

constituted a new substantive rule of constitutional law and, as such, applied

retroactively. “Because Miller determined that sentencing a child to life without

parole is excessive for all but the rare juvenile offender whose crime reflects

irreparable corruption, it rendered life without parole an unconstitutional penalty for

 11
 STATE V. AMES

 Opinion of the Court

a class of defendants because of their status[,]” a hallmark of a substantive rule of

constitutional law. Id. (internal marks and citation omitted).

 ********

 Four overarching points from this line of cases are worth highlighting.

 First, each case builds on the foundation “that children are constitutionally

different from adults for purposes of sentencing.” Id. at ___, 136 S. Ct. at 733 (internal

marks and citation omitted).

 Second, the developments in United States Supreme Court case law demand a

long and deep look at each juvenile defendant. Roper noted that the distinguishing

characteristics of youth render suspect any conclusion that a juvenile’s crime is

“evidence of irretrievably depraved character.” 543 U.S. at 570, 125 S. Ct. at 1195

(emphasis added). In that same vein, Graham spoke in terms of incorrigibility. See

560 U.S. at 72-73, 130 S. Ct. at 2029 (emphasis added); Montgomery, ___ U.S. at ____,

136 S. Ct. at 734 (speaking of “permanent incorrigibility”) (emphasis added). Miller

spoke of “irreparable corruption.” 567 U.S. at 479-80, 132 S. Ct. at 2469 (quoting

Roper, 543 U.S. at 573, 125 S. Ct. at 1197) (emphasis added). Montgomery indicated

life without the possibility of parole was justified only where “rehabilitation is

impossible[.]” ___ U.S. at ____, 136 S. Ct. at 733 (emphasis added). “Permanent

means forever. Irreparable means beyond improvement.” State v. Williams, ___ N.C.

App. ___, ___, 820 S.E.2d 521, 526 (2018) (quoting Sims, ___ N.C. App. at ___, 818

 12
 STATE V. AMES

 Opinion of the Court

S.E.2d at 413 (Stroud, J., concurring) (internal quotations omitted)). And, of course,

irretrievable means “cannot be retrieved[,]” VIII The Oxford English Dictionary 100

(2nd ed. 1989), incorrigible means “[i]ncapable of being corrected or amended[,]” id.

at 825, and impossible means “[n]ot possible[,]” id. at 732. In other words, the focus

is on whether “in 25 years, in 35 years, in 55 years—when the defendant may be in

his seventies or eighties—he will likely still remain incorrigible or corrupt, just as he

was as a teenager[.]” Williams, ___ N.C. App. at ___, 820 S.E.2d at 526 (quoting Sims,

___ N.C. at ___, 818 S.E.2d at 413 (Stroud, J., concurring)).

 Third, none of these teachings “about children . . . is crime-specific.” Miller,

567 U.S. at 473, 132 S. Ct. at 2465. Indeed, this line of cases dwells on the danger in

focusing the sentencing inquiry on the nature of the offense. Roper, 543 U.S. at 573,

125 S. Ct. at 1197 (“An unacceptable likelihood exists that the brutality or cold-

blooded nature of any particular crime would overpower mitigating arguments based

on youth as a matter of course[.]”); Graham, 560 U.S. at 59, 130 S. Ct. at 2021

(highlighting the “essential principle that, under the Eighth Amendment, the State

must respect the human attributes [such as potential for rehabilitation] even of those

who have committed serious crimes”); Miller, 567 U.S. at 472, 132 S. Ct. at 2465

(“[T]he distinctive attributes of youth diminish the penological justifications for

imposing the harshest sentences on juvenile offenders, even when they commit

terrible crimes.”). This recognizes the obvious: “almost all of the cases” subjecting

 13
 STATE V. AMES

 Opinion of the Court

juveniles to the harshest penalties “arose from heinous and shocking crimes[.]” State

v. May, 255 N.C. App. 119, 130, 804 S.E.2d 584, 591 (2017) (Stroud, J., concurring);

see Roper, 543 U.S. at 600, 125 S. Ct. at 1213 (O’Connor, J., dissenting) (“Christopher

Simmons’ murder of Shirley Cook was premeditated, wanton, and cruel in the

extreme.”); Roper, 543 U.S. at 619, 125 S. Ct. at 1223 (Scalia, J., dissenting) (citing

examples of “individuals under 18 . . . involve[d] [in] truly monstrous acts”); Graham,

560 U.S. at 112, 130 S. Ct. at 2051 (Thomas, J., dissenting) (recounting vicious

stabbing and rape in arguing for retaining possibility of juvenile life without the

possibility of parole for non-homicide offenses); Miller, 567 U.S. at 513, 132 S. Ct. at

2489 (Alito, J., dissenting) (noting “brutality and evident depravity” in case at issue);

Mongtomery, ___ U.S. at ___, 136 S. Ct. at 744 (Scalia, J., dissenting) (underlining

facts involved “17-year-old who murdered an innocent sheriff’s deputy”). Making the

facts of these awful crimes the lodestar in sentencing will result in “life imprisonment

without the possibility of parole [becoming] the rule and not the exception.” May, 255

N.C. App. at 130, 804 S.E.2d at 591 (Stroud, J., concurring).

 But a key teaching of these cases is that sentences of life without the possibility

of parole for juvenile offenders “will be uncommon.” Miller, 567 U.S. at 479, 132 S.

Ct. at 2469; see Montgomery, ___ U.S. at ___, 136 S. Ct. at 736 (sentencing juvenile to

life without the possibility of parole only appropriate in “exceptional circumstances”);

State v. James, 371 N.C. 77, 93, 813 S.E.2d 195, 207 (2018) (“[T]he imposition of a

 14
 STATE V. AMES

 Opinion of the Court

sentence of life imprisonment without the possibility of parole upon a juvenile [will]

be a rare event.”). This is the case in spite of the fact that differentiating “between

the juvenile offender whose crime reflects unfortunate yet transient immaturity, and

the rare juvenile offender whose crime reflects irreparable corruption . . . is difficult

even for expert psychologists[.]” Roper, 543 U.S. at 573, 125 S. Ct. at 1197. Indeed,

this reality “counsel[s] against irrevocably sentencing them to a lifetime in prison.”

Miller, 567 U.S. at 480, 132 S. Ct. at 2469.

 C. Developments in North Carolina Law Since Miller

 Our General Assembly responded to this sea change by replacing the statutory

regime that had automatically sentenced juveniles tried and convicted as adults for

homicide offenses to life without the possibility of parole, N.C. Gen. Stat. § 14-17

(2010), with one that requires trial courts to conduct hearings to determine whether

juvenile defendants convicted of first-degree murder not based on felony murder

“should be sentenced to life imprisonment without parole . . . or a lesser sentence of

life imprisonment with parole[,]” N.C. Gen. Stat. § 15A-1340.19B(a)(2) (2017). The

juvenile defendant may submit mitigating circumstances during this hearing,

including the following:

 (1) Age at the time of the offense[;]

 (2) Immaturity[;]

 (3) Ability to appreciate the risks and consequences of the
 conduct[;]

 15
 STATE V. AMES

 Opinion of the Court

 (4) Intellectual capacity[;]

 (5) Prior record[;]

 (6) Mental health[;]

 (7) Familial or peer pressure exerted upon the defendant[;]

 (8) Likelihood that the defendant would benefit from
 rehabilitation in confinement[;] [and]

 (9) Any other mitigating factor or circumstance.

N.C. Gen. Stat. § 15A-1340.19B(c) (2017).

 In James, 371 N.C. at 99, 813 S.E.2d at 211, our Supreme Court held this new

statutory regime constitutional. Central to its holding was a rejection of the notion

that the new regime created a presumption in favor of life without the possibility of

parole. See id. at 92-93, 813 S.E.2d at 207 (“[A] statutory sentencing scheme

embodying a presumption in favor of a sentence of life imprisonment without the

possibility of parole for a juvenile . . . would be, at an absolute minimum, in

considerable tension with the General Assembly’s expressed intent to . . . compl[y]

with Miller and with the expressed intent of the United States Supreme Court

that . . . the imposition of a sentence of life imprisonment without the possibility of

parole upon a juvenile be a rare event.”). Instead of applying such a presumption,

trial courts conducting these sentencing hearings should consider how the facts of a

particular controversy interact with both the statutorily enumerated mitigating

factors and the “substantive standard enunciated in Miller.” Id. at 89, 813 S.E.2d at

 16
 STATE V. AMES

 Opinion of the Court

204 (citation omitted). And, given that “Miller and its progeny indicate[d] that life

without parole sentences for juveniles should be exceedingly rare and reserved for

specifically described individuals,” id. at 96-97, 813 S.E.2d at 209, a trial court need

not “adopt and credit such mitigating evidence” to impose a sentence of life with the

possibility of parole, id. at 91, 813 S.E.2d at 206.

 Most recently, our Court held it was necessary to find a juvenile irreparably

corrupt before sentencing him or her to life without the possibility of parole.

Williams, ___ N.C. App. at ___, 820 S.E.2d at 526. The trial court in Williams made

“an explicit finding contrary” to concluding the defendant was irreparably corrupt.

Id. Accordingly, we vacated the defendant’s sentence of life without the possibility of

parole and remanded the case for resentencing “to two consecutive terms of life

imprisonment with the possibility of parole.” Id.2

 III. Defendant’s Sentencing Hearing
 After the jury convicted Defendant of first-degree murder, the trial court

conducted a brief hearing to consider whether to sentence him to life imprisonment

 2 The dissent questions the reasoning of Williams and, given that it has been stayed and will
be reviewed by our Supreme Court, its precedential value. State v. Ames, infra at ___ (Dillon, J.,
dissenting). There is a strong argument that it remains binding precedent, In re Civil Penalty, 324
N.C. 373, 384, 379 S.E.2d 30, 37 (1989) (“Where a panel of the Court of Appeals has decided the same
issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless
it has been overturned by a higher court.”) (emphasis added), and the dissent does not cite any authority
that supports its assertion to the contrary. State v. Ames, infra at ___ (Dillon, J., dissenting). But, even
if Williams were not binding, the trial court’s deviation from Roper, Graham, Miller, Montgomery, and
James is plain. Infra section III.

 17
 STATE V. AMES

 Opinion of the Court

with or without the possibility of parole. The trial court ultimately sentenced

Defendant to life imprisonment without the possibility of parole.

 As noted above, our Supreme Court has held that trial courts must comply with

“the substantive standard enunciated in Miller” when deciding whether to sentence

a juvenile to life without the possibility of parole. James, 371 N.C. at 89, 813 S.E.2d

at 204. The lodestar of Miller is that life without the possibility of parole “should be

reserved for the rare juvenile offender whose crime reflects irreparable corruption

rather than being imposed upon the juvenile offender whose crime reflects

unfortunate yet transient immaturity.” Id. at 92, 813 S.E.2d at 206 (internal marks

omitted). This focal point is informed by the fact that “children are constitutionally

different from adults for the purposes of sentencing.” Montgomery, ___ U.S. at ___,

136 S. Ct. at 733. It is “misguided to equate the failings of a minor with those of an

adult,” in part, because “a greater possibility exists that a minor’s character

deficiencies will be reformed.” Roper, 543 U.S. at 570, 125 S. Ct. at 1195-96.

 Defendant argues that the trial court sentenced him based on the incorrect

legal standard in violation of the Eighth Amendment. Specifically, Defendant asserts

that the trial court’s brief oral order not only fails to apply the standard articulated

in Miller but also transgresses the teaching that juveniles are constitutionally

different from adults. As the State conceded at oral argument – and is well settled

in our case law – these are both questions of constitutional law and thus reviewed de

 18
 STATE V. AMES

 Opinion of the Court

novo. Williams, 362 N.C. at 632, 669 S.E.2d at 294 (citation omitted). For the

following reasons, we agree with Defendant.

 A. Incorrect Legal Standard

 The crux of the trial court’s oral order sentencing Defendant to life without the

possibility of parole is “that the mitigating factors that have been found, that is of no

record and the age, are outweighed by the other evidence in this case of the offense

and the manner in which it was committed[.]”

 This approach finds no support in the case law. The consideration of whether

the Defendant is the rare, “irreparabl[y] corrupt[]” youth is, at a minimum, opaque

in the trial court’s balancing test. Miller, 567 U.S. at 479-80, 132 S. Ct. at 2469

(quoting Roper, 543 U.S. at 573, 125 S. Ct. at 1197). The trial court did not examine

whether the Defendant is “the rare juvenile offender who exhibits such irretrievable

depravity that rehabilitation is impossible and life without parole is justified[,]”

Montgomery, ___ U.S. at ___, 136 S. Ct. at 733, and the dissent explicitly rejects this

analysis, which is required. Ames, infra at ___ (criticizing the majority for “getting

ahead of the United States Supreme Court” by quoting and considering in its analysis

the above language from the United States Supreme Court) (Dillon, J., dissenting).3

 3 The dissent’s critique of our opinion’s (and, by extension, the governing case law’s)
consideration of whether a juvenile is beyond rehabilitation merely resurrects an already rejected
argument. Compare Montgomery. ___ U.S. ___, 136 S. Ct. at 744 (Scalia, J., dissenting) (Scalia, J.,
dissenting) (criticizing the “‘incorrigibility’ requirement that the Court imposes today” as “impossible
in practice” to apply) (emphasis added), with Ames, infra at ___ (“I do not believe that any judge has

 19
 STATE V. AMES

 Opinion of the Court

In place of the prescribed inquiry, the nature of the offense becomes the lodestar,

despite the fact that the case law warns against such a focus repeatedly in the context

of juvenile sentencing. Supra section II.B. Focusing the assessment in this fashion

made Defendant’s sentence far more likely. Were it to hold sway, this approach would

make life imprisonment without the possibility of parole “the rule and not the

exception[,]” May, 255 N.C. App. at 130, 804 S.E.2d at 591 (Stroud, J., concurring), a

result flatly inconsistent with precedent. James, 371 N.C. at 95, 813 S.E.2d at 208

(“[S]entences of life imprisonment without the possibility of parole for juveniles

convicted of first-degree murder should be the exception, rather than the rule[.]”).

 Nothing in the statutory sentencing regime runs contrary to this precedent,

nor could it given its origin. See id. at 92, 813 S.E.2d at 206 (“[T]he legislation in

which the relevant statutory provisions appear is captioned [a]n act to amend the

state sentencing laws to comply with the . . . decision in Miller v. Alabama[.]”)

(internal marks omitted). While the regime permits a defendant to bring forward

mitigating evidence, this is not obligatory. N.C. Gen. Stat. 15A-1340-19B(c) (2017)

(“The defendant or the defendant’s counsel may submit mitigating circumstances to

the court[.]”) (emphasis added). The statute “does not compel the conclusion that

persuading the sentencing court to adopt and credit . . . mitigating evidence is

necessary in order to preclude the imposition” of life without the possibility of parole,

the ability to look into the soul of a juvenile and declare that it would be ‘impossible’ for that juvenile
to ever be rehabilitated.”).

 20
 STATE V. AMES

 Opinion of the Court

James, 371 N.C. at 91, 813 S.E.2d at 206, a conclusion at odds with the trial court’s

balancing test and the dissent’s endorsement thereof.

 Simply put, nothing in the case law or our statutes supports the test the trial

court employed and the dissent defends.

 B. Improper Comparison of Defendant to Adult Offenders
 The trial court also found “that there is no evidence before the Court at this

juncture of the likelihood that Defendant would benefit from rehabilitation and

confinement other than that of other class of persons who may be incarcerated or may

be incarcerated for the offense of first degree murder.” Though not a model of clarity,

the trial court unmistakably compared Defendant to the entire universe of

individuals incarcerated for first-degree murder. The State conceded as much at oral

argument and its obvious implication: this universe includes adults. The dissent

finds no flaw in this approach. Ames, infra at ___ (Dillon, J., dissenting) (“I believe it

is totally appropriate for Judge Tillett to compare Defendant to adult murderers in

determining whether he should treat Defendant’s crime as one reflecting transient

immaturity.”).

 But comparing Defendant and his capacity for rehabilitation to adult offenders

transgresses the central tenet of the juvenile sentencing case law. See Miller, 567

U.S. at 481, 132 S. Ct. at 2470 (“[C]hildren are different[.]”); Roper, 543 U.S. at 570,

125 S. Ct. at 1195-96 (“[A] greater possibility exists that a minor’s character

deficiencies will be reformed.”).

 21
 STATE V. AMES

 Opinion of the Court

 ********

 While the dissent rightly notes that the trial court made reference to each of

the statutorily enumerated mitigating factors in its brief oral order, Ames, infra at

___ (Dillon, J., dissenting), it then considered them through a lens bearing little to no

relationship with “the substantive standard enunciated in Miller[,]” James, 371 N.C.

at 89, 813 S.E.2d at 204. Roper, Graham, Miller, and Montgomery establish no mere

boxes to check before a child is sentenced to a punishment the United States Supreme

Court has analogized to death. Recent developments in the law demand a long and

deep inquiry into whether a juvenile defendant is beyond rehabilitation before this

harshest penalty is imposed, a demand the trial court did not meet and the dissent

would elide.

 IV. Remedy
 Having determined that the trial court erred as a matter of law both in its

apprehension and application of the correct legal standard and, more particularly, by

comparing the Defendant juvenile to adult offenders, we now turn to the appropriate

remedy. Defendant urges us to enter a sentence of life with the possibility of parole,

pointing to Williams in support of its position. We must decline to do so, however, as

Williams is not on all fours with the current controversy and, as a general rule,

sentencing is a task for the trial court. See Williams v. New York, 337 U.S. 241, 247,

69 S. Ct. 1079, 1083, 93 L. Ed. 1337, 1342 (1949) (underlining that trial court judge’s

 22
 STATE V. AMES

 Opinion of the Court

“task within fixed statutory or constitutional limits is to determine the type and

extent of punishment after the issue of guilt has been determined.”).

 Whereas in Williams the trial court made a factual finding categorically at

odds with a sentence of life without the possibility of parole, see ___ N.C. App. at ___,

820 S.E.2d at 526, the errors requiring reversal here pertain to the legal standard

applied. Put another way, there is no factual finding in the trial court’s order

categorically at odds with a life without the possibility of parole sentence. 4

 To be clear: we do not mean to suggest that the trial court merely took the

wrong path to the right destination. The trial court found two statutory mitigating

factors, one of which, Defendant’s age, is a “mitigating factor of great weight[.]”

Eddings v. Oklahoma, 455 U.S. 104, 116, 102 S. Ct. 869, 877, 71 L. Ed.2d 1, 12 (1982).

Defense counsel argued that Defendant’s intelligence and continued educational

engagement while incarcerated was a mitigating factor, inasmuch as it showed he

was not beyond rehabilitation; however, this evidence seems curiously to have

counted, if anything, against Defendant during sentencing. In fact, the mitigation

 4 Defendant alleges that the trial court’s finding that “that there is no evidence before the
Court at this juncture of the likelihood that Defendant would benefit from rehabilitation” precludes a
sentence of life without the possibility of parole. Defendant reads this as the trial court stating
Defendant’s prognosis for rehabilitation is uncertain, the finding that led our Court in Williams to
directly enter a sentence of life with the possibility of parole. Williams, ___ N.C. App. at ___, 820
S.E.2d at 526. The State reads the same as merely connoting an (arguably dubious) absence of
evidence on point. Both interpretations strike us as plausible, which counsels caution in fashioning a
remedy. It is enough for us to simply reiterate that the Defendant need not persuade “the sentencing
court to adopt and credit . . . mitigating evidence” for a sentence of life with the possibility of parole to
be imposed, and the standard when assessing his prospects for rehabilitation is whether he is
“irreparabl[y] corrupt[][.]” James, 371 N.C. at 91, 813 S.E.2d at 206.

 23
 STATE V. AMES

 Opinion of the Court

case put on by Defendant’s counsel at sentencing, which included evidence of

Defendant’s youth, Defendant having been raised in a violent home environment, the

fact that Defendant did not shoot Graham, his rejection of a far less punitive plea

proposal, and his potential for rehabilitation, seemingly implicated every factor

Miller identified as counseling against sentencing a juvenile to life without the

possibility of parole. 567 U.S. at 477-78, 132 S. Ct. at 2468 (noting age, “family and

home environment[,]” “the extent of [Defendant’s] participation in the . . . homicide

offense[,]” “inability to deal with . . . prosecutors (including on a plea agreement)[,]”

and the “possibility of rehabilitation[,]” as factors worthy of consideration in

sentencing).

 V. Conclusion
 For the foregoing reasons, we vacate the trial court’s judgment and remand for

re-sentencing consistent with this opinion.

 VACATED AND REMANDED.

 Judge ZACHARY concurs.

 Judge DILLON dissents by separate opinion.

 24
 No. COA18-1035 – State v. Ames

 DILLON, Judge, dissenting.

 Judge Tillett is the sentencing judge in this case. He has the authority to

choose whether to sentence Defendant, upon his conviction for first degree murder,

to life without the possibility of parole (“LWOP”) or some lesser sentence, so long as

his sentence is not contrary to the Eighth Amendment or our General Statutes.

 Here, I conclude that Judge Tillett’s sentence of LWOP does not violate the

Eighth Amendment, for the reasons explained in Section I, below.

 Further, I conclude that Judge Tillett did not err in sentencing Defendant to

LWOP in accordance with our General Statutes, for the reasons explained in Section

II, below.

 Accordingly, I conclude that Judge Tillett properly exercised his discretion as

the sentencing judge in this case. Therefore, I respectfully dissent.

 I. Judge Tillett’s Order Does Not Violate the Eighth Amendment

 LWOP is “the second most severe [punishment] known to the law[.]” Harmelin

v. Michigan, 501 U.S. 957, 996 (1991). But as a LWOP sentence is markedly different

than a death sentence, Furman v. Georgia, 408 U.S. 238, 286 (1972), a LWOP

sentence is constitutionally permissible for adult offenders even for many non-violent

crimes, such as simply possessing a large amount of cocaine, Harmelin, 501 U.S. at

996, and may be imposed on adult offenders even without ever considering mitigating

factors or the “particularized circumstances of the crime and of the criminal.” Id. at

962.
 STATE V. AMES

 DILLON J., dissenting

 However, where the defendant is a juvenile offender, the United States

Supreme Court, as reiterated by our Supreme Court, has determined that the Eighth

Amendment is more restrictive on the ability to impose a LWOP sentence.

Specifically, a sentencing judge may impose a LWOP sentence on a juvenile offender

only in homicide cases and only on “ ‘the rare juvenile offender whose crime reflects

irreparable corruption,’ rather than ‘unfortunate yet transient immaturity.’ ” State

v. James, 371 N.C. 77, 95, 813 S.E.2d 195, 208 (2018) (quoting Miller v. Alabama, 567

U.S. 460, 479-80 (2012)) (emphasis added).

 Certainly, every homicide is horrific. But when committed by a juvenile, it is

the duty of the sentencing judge to determine whether the defendant’s horrific act

was borne out of transient immaturity; for example, was prompted by peer pressure.

 In the present case, I conclude that Judge Tillett properly considered

Defendant’s crime in essentially determining that it did not reflect transient

immaturity but rather irreparable corruption. Specifically, Judge Tillett noted how

Defendant was not influenced by peer or familial pressure, but rather was the

ringleader, manipulating an unwitting accomplice to participate in the murder.

Judge Tillett noted how Defendant concocted an elaborate scheme to lure his victim

into a vulnerable situation and how, after the murder, Defendant orchestrated an

elaborate cover-up of the crime. Judge Tillett found that Defendant was intelligent,

 -2-
 STATE V. AMES

 DILLON J., dissenting

that he showed no signs of “immaturity,” “mental illness or impairment,” and that

Defendant was able “to appreciate the risk and consequences of his” actions.

 The majority, however, suggests that the proper test under the Eighth

Amendment goes further than merely determining whether the crime reflects

irreparable corruption. Specifically, the majority suggests that a LWOP sentence

may not be imposed unless the sentencing judge is able to determine that the juvenile

himself is irreparably incorrigible, that is, the judge is able to determine that it is

“impossible” for the juvenile to ever be rehabilitated.

 In a case cited by the majority, another panel of our Court last year, in a case

currently at our Supreme Court, made this same error, getting ahead of the United

States Supreme Court. State v. Williams, ___ N.C. App. ___, ___, 820 S.E.2d 521, 526

(2018). Specifically, the Williams panel held that a LWOP sentence may not be

imposed on a juvenile offender unless the sentencing judge makes a “threshold

determination” that the defendant, himself, is “irreparably corrupt[.]” Id. We are not

bound by Williams at this point, as our Supreme Court granted the State’s motion to

stay that opinion, based on the effect that the opinion could have on other cases. State

v. Williams, 371 N.C. 572, 818 S.E.2d 639 (2018); see also State v. Williams, ___ N.C.

App. ___, ___, 828 S.E.2d 21, 22 (2019) (allowing the State’s petition “for Writ of

Supersedeas of the judgment of the Court of Appeals”).

 -3-
 STATE V. AMES

 DILLON J., dissenting

 While the United States Supreme Court has made a lot of statements

suggesting that a LWOP sentence should be extremely rare and should be for the

worst of juvenile offenders, that Court has held that a LWOP sentence for a juvenile

offender is constitutionally permissible if the sentencing judge merely determines

that “the crime” itself was one which “reflects” irreparable corruption. Miller, 567

U.S. at 479-80. In Montgomery, the most recent seminal case on this issue, that Court

clearly stated that “Miller’s substantive holding [was] that life without parole is an

excessive sentence for children whose crimes reflect transient immaturity,”

Montgomery v. Louisiana, ___ U.S. ___, ___, 136 S. Ct. 718, 735 (2016) (emphasis

added), and that the Court was now requiring that a sentencing judge considering a

LWOP sentence must conduct a hearing to determine whether the juvenile offender’s

crime reflected transient immaturity, id.

 Requiring that a sentencing judge must be convinced that the defendant

himself is incapable of rehabilitation, as suggested by the majority and by our panel

in Williams, would effectively eliminate LWOP sentences in all cases involving

juvenile offenders. I do not believe any sentencing judge, more or less any human

being, can ever say that a juvenile offender is beyond moral redemption. I do not

believe that any judge has the ability to look into the soul of a juvenile and declare

that it would be “impossible” for that juvenile to ever be rehabilitated. Indeed, the

Fourth Circuit Court of Appeals has recognized this reality in a case decided just last

 -4-
 STATE V. AMES

 DILLON J., dissenting

year, a case that is headed to the United States Supreme Court this term. See

Mathena v. Malvo, ___ U.S. ___, 139 S. Ct. 1317, 2019 U.S. LEXIS 1905 (2019)

(granting certiorari). That case involves Lee Boyd Malvo, one of the D.C. snipers who

was a juvenile at the time of his 2002 killing spree, and who received a sentence of

LWOP prior to Miller and Montgomery being decided. The Fourth Circuit Court

affirmed an order granting Mr. Malvo a Miller hearing to determine if his crime

indeed reflected irreparable corruption rather than transient immaturity. Malvo v.

Mathena, 893 F.3d 265, 277 (4th Cir. 2018). The Fourth Circuit concluded its opinion

by recognizing that no judge, though, could predict how Mr. Malvo himself will turn

out, stating that “who knows but God how [Mr. Malvo] will bear the future.” Id. In

any event, it may be that in reconsidering the issue, the Supreme Court will again

reinterpret the Eighth Amendment by determining that all LWOP sentences for

juvenile offenders are unconstitutional. Who knows? But it is not for us to apply a

new test which would essentially make that decision for that Court.

 I recognize that our General Assembly has provided that a sentencing judge is

to consider the “[l]ikelihood that the defendant would benefit from rehabilitation in

confinement.” N.C. Gen. Stat. § 15A-1340.19B(c)(8) (2018). While this is an

important factor, it is only one of a number of statutory mitigating factors to be

considered and weighed by the sentencing judge. It is not an absolute requirement

under the statute, much less the Eighth Amendment as interpreted by the United

 -5-
 STATE V. AMES

 DILLON J., dissenting

States Supreme Court, that the sentencing judge must absolutely determine that a

juvenile offender could never benefit from rehabilitation as a prerequisite of imposing

a LWOP sentence. The statute only requires that the sentencing judge consider any

evidence that a juvenile offender might benefit when considering the appropriate

sentence.

 II. Judge Tillett Made Sufficient Findings Under Section 15A-1340.19B

 Our General Assembly allows a juvenile offender convicted of first degree

murder, not involving felony murder, to introduce evidence concerning eight specific

mitigating factors and “any other mitigating factor” when deciding whether to impose

a LWOP sentence. N.C. Gen. Stat. § 15A-1340.19B(c). In a holding affirmed by our

Supreme Court, our Court held that a sentencing judge must make findings as to each

of the enumerated factors. State v. James, 247 N.C. App. 350, 364-66, 786 S.E.2d 73,

82-84 (2016), affirmed in part and modified in part, State v. James, 371 N.C. 77, 813

S.E.2d 195 (2018).

 In the present case, Judge Tillett properly considered each of the statutory

factors listed in Section 15A-1340.19B. He determined that two were applicable, but

that the others were inapplicable. Specifically, Judge Tillett found that there was no

evidence that Defendant was immature. Judge Tillett found that Defendant had the

ability to appreciate the risks and consequences of his conduct; that he had a strong,

above-average intellectual capacity that was not impaired; that he had no mental

 -6-
 STATE V. AMES

 DILLON J., dissenting

health issues; that his crime was not influenced by any familial or peer pressure; and

that there was no evidence that Defendant would benefit from rehabilitation any

more than anyone else convicted of first degree murder. Judge Tillett did find that

Defendant’s age and the lack of a prior record were mitigating factors.

 Judge Tillett, as the sentencing judge, considered the two mitigating factors

that he found and how they interplayed with his determination regarding the crime

itself, and concluded that a sentence of LWOP was appropriate in this particular case.

It may be that other judges would have given Defendant a lesser sentence. But our

job is simply to determine if Judge Tillett exceeded his authority or failed to apply

the law correctly. I conclude that he did not.

 The majority takes issue with Judge Tillett’s finding concerning the statutory

mitigating factor regarding whether there is a “[l]ikelihood that the defendant would

benefit from rehabilitation[.]” N.C. Gen. Stat. § 15A-1340.19B(c)(8). Specifically, the

majority takes issue that Judge Tillett improperly compared Defendant with adult

murderers, rather than other juvenile murderers. I disagree.

 I believe it is totally appropriate for Judge Tillett to compare Defendant to

adult murderers in determining whether he should treat Defendant’s crime as one

reflecting transient immaturity. But assuming Judge Tillett was required to compare

Defendant’s likelihood of rehabilitation to other juvenile murderers, his findings

essentially do this anyway. That is, it is a given that a juvenile murderer is presumed

 -7-
 STATE V. AMES

 DILLON J., dissenting

to have a greater likelihood of rehabilitation than an adult murderer. But in finding

that the likelihood of Defendant’s rehabilitation was equal to the likelihood of an

adult murderer, it logically follows that Judge Tillett was necessarily determining

that Defendant’s likelihood at rehabilitation was less than that of a juvenile

murderer.

 The majority also takes issue that Judge Tillett did not consider the statutory

mitigating factors “through the lens” of the “substantive standard enunciated in

Miller,” as required by our Supreme Court in James, 371 N.C. at 83, 89, 813 S.E.2d

at 201, 204. But, again, this “substantive standard enunciated in Miller” is to

determine whether “[the] crime[] reflect[s] transient immaturity.” See Montgomery,

136 S. Ct. at 735 (describing “Miller’s substantive holding [to be] that life without

parole is an excessive sentence for children whose crimes reflect transient

immaturity”). And Judge Tillett did just that. He viewed the two mitigating factors

that he found present, i.e., Defendant’s age and lack of prior record, through the lens

of the crime that Defendant committed. Judge Tillett did not consider the factors

through the lens of the brutality of the crime, as all homicides are brutal. Rather, he

appropriately considered them through the lens of how Defendant’s crime did not

reflect transient immaturity.

 For these reasons, I would uphold Judge Tillett’s sentencing of Defendant to

LWOP.

 -8-